UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL WAYNE, D.O.,

       Plaintiff,                        CASE NO. 06-CV-15081

-vs-                                     PAUL D. BORMAN
                                         UNITED STATES DISTRICT JUDGE

DETROIT MEDICAL CENTER NON-
QUALIFIED DEFERRED COMPENSATION
PLAN, and DETROIT MEDICAL CENTER,

       Defendants.
_____/

**OPINION AND ORDER
(1) GRANTING DEFENDANTS' MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION;AND
(2) DENYING AS MOOT DEFENDANTS' MOTION TO STAY DISCOVERY**

Before the Court are Defendants' (1) December 13, 2006 Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket No. 4); and (2) January 25, 2007 Motion to Stay Discovery (Docket No. 13). The Court held a motion hearing on February 14, 2007. Having considered the entire record, and for the reasons that follow, the Court GRANTS Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and DENIES AS MOOT Defendants' Motion to Stay Discovery.

**I.**     **BACKGROUND**

This case arises out of a dispute between Plaintiff Michael Wayne, D.O. ("Plaintiff") and Defendant Detroit Medical Center ("Defendant") concerning a deferred compensation agreement. Defendant argues that Plaintiff's deferred compensation plan does not implicate ERISA, thus this Court lacks subject matter jurisdiction over non-diverse parties.

1

Plaintiff is a licensed doctor of osteopathic medicine in the State of Michigan. (Am. Compl. ¶ 1). Defendant is a Michigan non-profit corporation with its principal place of business in Wayne County, Michigan. (Am. Compl. ¶ 3).

On November 1, 1996, Defendant purchased Plaintiff's family medical practice, Michigan Family Physicians Institute, P.C., that had been held by Plaintiff and other doctors. (Am. Compl. ¶ 4).

Concurrent with the purchase of the medical practice, Plaintiff and Defendant entered into an employment contract. (Am. Compl. ¶ 5, Ex. 1, 1996 Employment Agreement). The employment agreement established, inter alia, that Plaintiff would agree to provide services as a physician for Defendant in exchange for a salary, benefits, and certain deferred compensation in the amount of $750,000. (Am. Compl. ¶¶ 6, 17). The employment contract specified that in order to be eligible for the deferred compensation, Plaintiff had to remain employed with Defendant for a period of seven (7) years and abide by a contractual non-compete clause for ten (10) years.

In March 2000, Plaintiff was terminated from his employment with Defendant. Plaintiff and Defendant entered into a new Agreement and Release on March 1, 2000. (Def. Br. Ex. C, Agreement and Release). Under Plaintiff's previous 1996 employment agreement, termination of employment prior to seven (7) years disqualified him from receiving any deferred compensation. The March 2000 Agreement terminated Plaintiff's salary, fringe, and disability benefits and provided that Plaintiff would still be entitled to his $750,000 deferred compensation plan, as long as he agreed to abide by the non-competition agreement until November 1, 2006. (*Id.*)

Consistent with those terms, Plaintiff made a timely demand for his deferred compensation and chose to receive $716,000 as a lump sum, rather than $750,000 over five (5)

years. (Am. Compl. ¶ 20). Defendant contends that Plaintiff violated the non-competition provision and has refused to pay the deferred compensation under the 2000 Agreement.

Plaintiff filed the instant action on November 13, 2006, pursuant to ERISA, claiming that he is entitled to the deferred compensation plan. Plaintiff filed an Amended Complaint on January 4, 2007. (Docket No. 7).

Defendants filed a Motion to Dismiss on December 13, 2006, arguing that the Court lacks subject matter jurisdiction since Plaintiff's claim does not fall under ERISA. (Docket No. 4). Defendants also filed a Motion to Stay Discovery until the resolution of the motion to dismiss. (Docket No. 13).

## II.   ANALYSIS

### A.   Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction

Under FRCP 12(b)(1), the party that invokes federal subject matter jurisdiction has the burden of persuading the Court that subject matter jurisdiction exists in this case. *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 671 (6th Cir. 2005). The Court is empowered to resolve factual disputes when subject matter jurisdiction is challenged. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

### B.   ERISA and the Deferred Compensation Agreement

Defendant argues that (1) the deferred compensation arrangement does not constitute an "employee benefit plan" under ERISA and (2) alternatively, even if it did constitute an ERISA plan, the plan was unfunded.

####     1.   Employee Benefit Plan

3

Defendant contends that Plaintiff's deferred compensation arrangement is not an "employee benefit plan" under ERISA – rather a contractual arrangement governed by state law. (Def. Br. 3). Defendant contends that an employment benefit plan is governed by ERISA if (1) it requires a continuing or ongoing administrative scheme or practice to provide the benefits and (2) if it does not only include limited, or a single, payment(s) to a former employee that does not require an administrative scheme.

Defendant maintains that the compensation arrangement at issue is only a "one-time, lump sum payment triggered by a single event that may not necessarily occur." (*Id*.). Defendant contends that Plaintiff's entitlement under the 1996 employment agreement to the deferred compensation lapsed when he terminated his employment in March 2000. (*Id*.). The parties executed a subsequent agreement concerning Plaintiff's deferred compensation in March 2000. The Amendatory Agreement, applying only to Plaintiff, stated that Plaintiff could collect his $750,000 deferred compensation benefits if he continued to abide by his contractual non-compete agreement through November 2006. (*Id*. 4).

Around August 2006, Plaintiff elected to receive a single, lump-sum payment of $716,000, rather than the $750,000 over five (5) years. Defendant claims that the "triggering event" for the request was Plaintiff's purported compliance with his non-compete agreement up through November 1, 2006. Defendant avers that under the 1996 employment contract and the 2000 agreement, it was not required to implement any "administrative scheme" or perform and "ongoing, particularized, administrative, discretionary" analysis to meet its obligations. (*Id*.). Furthermore, the obligation for Defendant to pay was predicated on whether Plaintiff fulfilled his non-compete agreement. Even if he did, according to Defendant, its obligations to Plaintiff

would have been calculated using a fixed formula – either a discounted lump sum or installment payments over several years. (*Id*.). Therefore, Defendant urges the Court to find that ERISA does not govern Plaintiff's claim.

Plaintiff responds that Defendant's deferred compensation arrangement required "ongoing decisions based on subjective criteria." (Pl. Resp. 4). Plaintiff argues that the following aspects of the arrangement would implicate administrative schemes and discretionary decisions. For example, the administrator would have to determine whether (1) the participants reached the age of eligibility, (2) to forfeit the participant's benefits due to termination or violation of the non-compete agreements, and (3) to award benefits to participants based on death, full, or partial disability. (*Id*. 4-5). Plaintiff also asserts that four other physicians had this arrangement, thus the conditions of the 1996 and 2000 agreements were not unique to Plaintiff. Therefore, according to Plaintiff, the Court should conclude that it has subject matter jurisdiction over this case because the deferred compensation agreement was an "employment benefit plan" for the purposes of ERISA.

        2.      Funding

Defendant argues alternatively that even if the deferred compensation plan qualified as an "employee benefits plan," the "plan" has never been funded, pursuant to 29 U.S.C. § 1003(b)(5). Defendant maintains that there was "no separate res established for the benefit of" Plaintiff. (Def. Br. 5). Defendant states that when it purchased Plaintiff's practice and became the sole owner and beneficiary of Plaintiff's life insurance policy, "it contemplated creating a vehicle that *together with other investments* would generate assets to informally offset all of a portion of [Defendant's] deferred compensation liability under the 1996 agreement." (*Id.*) (emphasis in

5

original). As owner and beneficiary of the policy, Defendant "retained all rights to the policy" and the assets generated by the life insurance policy "were subject to the claims of [Defendant's] general creditors." (*Id*. 6). Therefore, according to Defendant, the plan was "unfunded" for the purposes of ERISA. (*Id*.).

Defendant claims that the 2000 Amendatory Agreement makes it "clear" that Defendant did not have an obligation to fund the deferred compensation. In addition, Defendant attaches a January 14, 2004 letter from Defendant's counsel to Plaintiff's attorney in response to Plaintiff's inquiries about the "funding" of the deferred compensation plan. (Def. Br. 6, Ex. D January 14, 2004 Letter).

Plaintiff responds, in essence, that the 1996 employment contract and the 2000 Agreement both explicitly guarantee that the deferred compensation would be funded. (Pl. Resp. 5-7). Plaintiff also argues, correctly, that the January 14, 2004 Letter to Plaintiff's counsel does not impact the content of the 1996 and 2000 agreements.

However, the Court finds Defendant's argument has no merit on this point. The Supreme Court in *Fort Halifax* has clarified that even though the benefit funds are paid out of the general assets of a company instead of a separate fund, the benefit plan still can be governed by ERISA. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 17-18 (1987). Instead, the relevant inquiry is whether the benefits are being paid pursuant to a plan. *Id*. at 18. Defendant's explanation to Plaintiff for its handling of money supposedly earmarked for the deferred compensation plan simply amounts to the fact that the compensation would have come out of Defendant's "general assets."

       3.      Discussion

In order for the Court to determine whether the instant case implicated ERISA, it is necessary to examine the relevant contractual provisions between the parties.

After the purchase of Plaintiff's family medical practice, Plaintiff agreed to become Defendant's employee. The parties negotiated and executed an employment contract on September 17, 1996. Section 4 of Plaintiff's 1996 employment governed his compensation as an employee of Defendant. Section 4a established Plaintiff's base salary. Section 4b provided for a "practice bonus" if certain conditions were met. Section 4c stated that Plaintiff would receive "fringe benefits" accorded to other full-time physicians. In regards to the deferred compensation plan, the 1996 employment contract states in relevant part:

> 4. COMPENSATION
> . . . .
> d. <u>Nonqualified Deferred Compensation Subject to Substantial Risk of Forfeiture</u>
>
> [Defendant] will establish a nonqualified deferred compensation plan with substantial risk of forfeiture for you. [Defendant] shall continue in effect the life insurance policy purchased by [Defendant] from Michigan Family Physicians, P.C. (the "Life Policy"), and also shall purchase additional life insurance or annuities or make investments with total payments of not less than $150,000 per year for the Group, with the intent that life insurance and annuity purchases and additional investments shall be sufficient to ensure sufficient funding to fund nonqualified deferred compensation payments in 10 years if the substantial risk of forfeiture provisions are satisfied. You shall receive a copy of the nonqualified deferred compensation plan upon the effective date of your employment and annual statements regarding the plan's financial status. [Defendant] shall be both the owner and beneficiary of the Life Policy.
>
> Funding shall be sufficient to fund payments in total of $750,000 beginning ten years after the effective date of this Agreement, and payable 20% on the anniversary date ten years after the effective date and the remainder in four equal payments each year thereafter until the total deferred compensation is paid. You shall forfeit the remaining payments in the event you compete during the four year payment period. Funding shall be derived from guaranteed compensation pool for the Group – up to $150,000 per year. If you terminate your employment prior to the end of the initial seven year term of this Agreement, [Defendant] shall

> keep the policy and all funding as compensation for your nonperformance, except as otherwise provided herein.
>
> You shall be entitled to the deferred compensation provided that
>
>     (a)    you have not competed in violation of this Agreement for a period of ten years following the effective date, and
>
>     (b)    you have been continuously employed pursuant to this Agreement for a term of seven years, and
>
>     (c)    you have reached age 50 on the date the initial payment is due.
>
> The initial payment shall be made on the date you turn 50 if later than the ten year anniversary date, or the ten year anniversary date.
>
> <u>Forfeiture</u>
>
> You shall forfeit any right you may have to nonqualified deferred compensation if you do not fulfill all three conditions: noncompetition for 10 years, seven complete years of employment and age 50. If you violate the noncompete clause, you shall receive no deferred compensation. On the initial payment date, you may elect to receive the present value of payments over the next four years. You must provide 90 days prior written notice of the present value election.

(Am. Compl. Ex. 1).

Section 4e of the employment contract specified that Plaintiff would be entitled to the deferred compensation under a "total disability" if Plaintiff did not compete in violation of the contract and was totally disabled. Similarly, Plaintiff would receive his deferred compensation under a "partial disability" if Plaintiff (a) did not compete, (b) was partially disabled, and (c) continued to be employed by Defendant and to perform professional services. Plaintiff would receive a base salary, plus a pro rata rate of the professional duties he was able to perform with the partial disability.

The 2000 Agreement terminated all of Plaintiff's benefits under the 1996 employment agreement. The Agreement provided that he would be entitled to his deferred compensation, if he continued to abide by the original 1996 non-competition clause:

> NOW THEREFORE, in consideration of the mutual covenants and conditions herein set forth, the parties agree as follows:
>
> 1. Subject to the provisions of this agreement, the provisions of paragraph 4d of [Plaintiff's] employment agreement, a copy of which is attached hereto as Exhibit A, shall survive termination of the employment agreement.
>
> 2. [Plaintiff] shall not be required to be continuously employed for a term of years in order to be eligible for the deferred compensation described in paragraph 4d of Exhibit A. All other conditions for the deferred compensation must be fulfilled.
>
> 3. [Defendant] shall ensure that the deferred compensation arrangements are funded in an actuarially sound manner and will provide periodic statements to [Plaintiff]. Plaintiff consents to [Defendant] surrendering any insurance policies pertaining to [Plaintiff], provided the cash value or its equivalent is applied to funding of the deferred compensation arrangement described in paragraph 4d of Exhibit A.
>
> 4. [Plaintiff] agrees that the non-competition provisions in his employment agreement shall survive the termination of the employment, but shall be modified to read as follows:
>
>> For the period commencing with the effective date of this agreement and continuing until the final payment of all deferred compensation, [Plaintiff] shall not, directly or indirectly, own, be an owner, partner, or shareholder of, or enter into any employment or any consulting arrangement with any hospital, hospital system, or health care organization, not affiliated with [Defendant], within 75 miles of [Defendant's] corporate headquarters unless [Plaintiff] has obtained prior written permission to do so from [Defendant's] President/CEO.

(Def. Br. Ex. C).

Since neither party has challenged the validity of the 2000 Agreement, the Court must now determine whether ERISA governs the 2000 agreement.

Congress passed ERISA in 1974 "to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits." *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989). However, the Supreme Court has held that an employee benefit plan falls under ERISA only if it establishes benefits requiring "an ongoing administrative program to meet the employer's obligations." *Fort Halifax,* 482 U.S. at 11.

The Sixth Circuit recently clarified the distinction between determining (1) whether there is an ERISA plan and (2) whether a "severance agreement" plan falls under ERISA. In the former situation, courts (1) determine whether the Department of Labor "safe harbor" regulations are applicable; (2) look to surrounding circumstances to whether a reasonable person could ascertain the intended benefits, the class of beneficiaries, the source of financing, and the procedures for receiving benefits; and (3) establish whether the employee has established or maintained a plan with the intent of providing benefits to its employees. *Thompson v. American Home Assurance Co.*, 95 F.3d 429, 434-35 (6th Cir. 1996).

To determine whether a severance agreement plan falls under ERISA, courts look to (1) whether the employer has discretion over the distribution of benefits and (2) whether there are ongoing demands on an employer's assets. *Kolkowski v. Goodrich Corp.*, 448 F.3d 843, 848 (6th Cir. 2006). In determining the degree of "discretion" an employer retains, the *Kolkowski* court explained:

> The degree of discretion retained by the employer over the distribution of benefits is one important factor in deciding whether a severance plan is an ERISA plan. . . . Another important factor is whether the delivery of benefits creates an on-going demand on employer assets.
> . . . .
> Plans in which benefits are predetermined or which involve simple or mechanical determinations have been found not to be ERISA plans. . . . On the other hand, if to determine benefits the employer must analyze each employee's particular circumstances in light of the appropriate criteria, the severance plan is probably an ERISA plan.

*Id*. (quoting *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 614 (6th Cir. 2002)). The *Kolkowski* court also held that the ongoing benefits prong is where an employer "assumes responsibility to pay benefits on a regular basis, and this faces periodic demands on its assets that create a need for financial coordination and control." *Kolkowski*, 448 F.3d at 849 (quotation and citation omitted).

The Court finds that Plaintiff's deferred compensation plan should be evaluated as a "severance" agreement. Plaintiff's deferred compensation plan was a benefit conditioned upon his fulfillment of the 1996 employment agreement. The 2000 Agreement entitled Plaintiff to the deferred compensation payout if he abided by a non-competition agreement until November 2006. Under *Kolkowski*, the Court must evaluate whether Defendant has retained discretion over the distribution of the benefits and whether there is an ongoing demand on Defendant's assets.

In addition to *Kolkowski*, Defendant cites *Fort Halifax* and the Fifth Circuit case *Tinoco v. Marine Chartering Co.* to support its argument that courts consider employer obligations that are based upon a single contingency and a fixed formula do not fall under ERISA.

In *Fort Halifax*, the Supreme Court considered an ERISA preemption claim involving a Maine statute providing that an employer disburse a one-time severance payment to employees

11

in event of a plant closing. 482 U.S. at 5-7. The Court held that ERISA did not preempt the Maine law:

> The Maine statute neither establishes, nor requires an employer to maintain, an employee benefit *plan*. The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id*. at 12. (emphasis in original).

In *Tinoco*, an employer provided an early retirement plan whereby employees who had worked for the company for fifteen years and attained the age of 55 would be eligible. 311 F.3d 617 (5th Cir. 2002). The plan was unfunded and paid out of the company's general assets. *Id*. at 618. The plan offered the plaintiffs a choice of either a lump-sum payment or a stream of payments until they reached 62. *Id*. at 622. The court held that "[r]egardless of how Appellees chose to receive those payments, the total amount to be paid was based on a one-time calculation using a fixed formula." *Id*. The court further found that "Appellees provide no evidence that the [health plan] requires an administrative scheme to make ongoing discretionary actions based on subjective criteria" and that simply because the employer gave the employees "the option of receiving payment over a period of time does not mean that the [health plan] amounts to an administrative scheme." *Id*.

In *Kolkowski*, the Sixth Circuit considered a situation involving an employment arrangement where an employee would receive benefits due to "involuntary termination" within two years of a change in control in the company or in a division of the company. 448 F.3d at 845. The policy considered an employee "involuntarily terminated" if after the change of control (1) the base salary offered was lower than the employee's highest prior base salary or (2) the employee benefits offered by the new employer were not "at least comparable" to the prior benefits offered. *Id*. The court held that this arrangement involved the requisite discretion to fall under ERISA. The court observed that the administrator's authority to determine (1) whether the benefits offered by the acquiring company were "at least comparable" to the prior benefits and (2) an employee's seniority status to calculate the amount of severance pay due was "more than [a] simple, mechanical function." *Id.* at 848-49.

In the present case, the only discretionary decision-making authority enjoyed by Defendant, pursuant to the 2000 Agreement, was to monitor Plaintiff for possible violations of his non-compete agreement.

Even if the Court found that this discretion, in itself, was sufficient to satisfy the first prong of the *Kolkowski* test, Defendant's plan does not meet the "ongoing benefits" analysis. Although Plaintiff's original 1996 employment contract provided for fringe and disability benefits, the 2000 Agreement eliminated those benefits and stated that Plaintiff was relieved from his original obligation to continue his employment for Defendant for seven years and was entitled to the deferred compensation only if he continued to abide by a non-compete covenant through November 2006.

The only "benefit" due to Plaintiff under the 2000 Agreement was his $750,000 deferred compensation. The Court finds that the payout of the deferred compensation is not an "ongoing benefit," and likewise falls into the category contemplated by *Fort Halifax*, i.e. where the employer is required to make a lump-sum payment, triggered by a single event, after which the Defendant does not retain any discretionary authority and is not required to create an ongoing administrative program to distribute employee benefits.

From the foregoing discussion, the Court concludes that ERISA does not cover Plaintiff's claims. Therefore, the Court GRANTS Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction.

### III.  CONCLUSION

For the foregoing reasons, the Court:

(1) **GRANTS** Defendant's Motion to Dismiss Based Upon Lack of Subject Matter Jurisdiction; and

(2) **DENIES AS MOOT** Defendant's Motion to Stay Discovery.

**SO ORDERED.**

> s/Paul D. Borman
> PAUL D. BORMAN
> UNITED STATES DISTRICT JUDGE

Dated:  February 23, 2007

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on February 23, 2007.

 

s/Denise Goodine
Case Manager

15